Number 171431, Marisol Macheo-Acevedo v. Stericycle of Puerto Rico, Inc. Mr. Gonzalez, good morning. Good morning, guys. I'm going to try to pick up a little bit on what has gone on in the previous case because this case is very similar. It's an easy case because the standard for summary judgment is very clear. It's an easy case because the discrimination and retaliation law is very clear. And it is an easy case because the district court's departures from the standard based on the evidence on the record warranted that a jury try this case. I, rather than go into all the details because of the lack of time, I would like to point to there are three instances and I'm going to talk first about retaliation. On November 21 and at page 1243 of the appendix, there's a chart discussing the interrelation between several emails which depict that Ms. Monica Bloomfield, who's the HR manager in Illinois of the brand company, is exchanging information with the two higher officers of the Puerto Rico corporation who are both respondents in the charge filed in the anti-discrimination unit. And she's telling them that she, Ms. Bloomfield, wants to make sure that all the policies and procedures are followed. 44 minutes later, she makes a 180 turn because she found out that Ms. Michelle claimed retaliation. That is on November 21. On November 22, the following day, there's an instance where Ms. Michelle understands that she was excluded from a federal lunch for a federal employee. And why this is so important, for two reasons. Number one, what she claimed was based on evidence on the record, number one. And number two, what Steric Cycle did to equate protective conduct with insubordination could not be the basis for her termination eventually. If we look at that federal lunch, the position of Steric Cycle and of Mr. Santana and Mr. Rivera was that it was routine. As a matter of fact, his email at page 692 says, I repeat again before reaching any erroneous conclusion from your report, contact me to clarify your concerns. Your lack of professionalism and unfounded conclusions on a simple lunch after a four-hour meeting with salespeople which is routine does not make this a thanksgiving lunch. This letter is proof of your insubordination and lack of ethics. With the duties that you are performing in this company, I hope this letter stops at once and that you focus on attending to the daily tasks or work tasks, the ones that benefit Steric Cycle. In this meeting, that supposedly was a routine lunch and she was making unfounded allegations, there was testimony that the district court disregarded from an employee from the sales force but who was not from the sales department but who did not attend routine meetings. Can you address something for me? There was evidence from the defendants that they had received more than a few complaints from outside hospitals who used the company's products complaining about the plaintiff and that that was a major part of the termination decision. What's your response? Please answer my question. She was handed a PAP on December 20, 2013 and she was given the opportunity and according to the policies of Steric Cycle, a PAP is to allow, to help her so she can correct her attitude or performance, whatever they understand is the behavior needs to be corrected so that she can continue being an employee. Do you concede that those complaints were made about her? No, Your Honor. Yes or no? Yes, as to the one on January 16. It's one. But the thing is, Your Honor, in Steric Cycle, the policies, to terminate an employee in Puerto Rico, they needed to establish gross misconduct. That is in the appendix at page 1017. Nowhere has Steric Cycle presented evidence that there was gross misconduct on the part of Ms. Michell. Not only that, I asked Ms. Bloomfield in her deposition to tell me if Ms. Michell's conduct had constituted gross misconduct. And she said that it did not. So this is relevant to the pretext argument? Pardon me? The point you're making now is relevant to showing pretext? Yes, Your Honor, because it was not sufficient. You say a jury could reasonably find that the only basis that they gave for termination didn't meet what they would know to be their obligations as to what they would have to show in order to dismiss her. Therefore, the argument they gave, though non-discriminatory, is a jury-defined pretextual. That is correct, Your Honor. And it's also pretextual on their coaching of, because they were departing from their policies. Steric Cycle is claiming business judgment. Business judgment cannot go against a standard that the company voluntarily sets for itself. Let's forget for Ms. Michell as a single employee. How employees in Steric Cycle would know what would they be against if the policies are just selectively used whenever the company wants to justify a termination? There was evidence that when she was given the PIP, she wanted to write in the PIP that she understood that it was an act of retaliation. They would not allow it. They put it in a shredder and gave her a new copy. Now, when they responded to her, I may be misremembering the record, I thought there was an argument or a finding by the district court that when they were responding to her complaints for purposes of the retaliation claim, she did not make clear that her complaint was based on discriminatory conduct. And therefore, the retaliation claim just is missing a fundamental premise that it needs to have. So even if you can show pretext, you've got a basic problem, which is where is the indication that the things that were done to her that were adverse were in retaliation for protected conduct as opposed to just complaints? Yes, because the fundamental problem is with the court's opinion. I will tell you, at page 24, the court addresses and says the October letter by the attorneys and the charge are protected conduct. So from October 22nd, when the letter was sent on, we are going to look at every instance through a retaliatory lens, which is the way it's supposed to be. Did that letter mention her concern about having been discriminated on the basis of sex? Oh, yes. It was very clear in the October letter. Oh, yes, yes. That letter is at page 671. It says, we have been detained by Ms. Maisel-Michel in order to file a complaint against the recycled Puerto Rico, Luis Barredo, Osvaldo Santana, Antonio Gonzalez and you, who was one of the decision-makers together with Ms. Bloomfield, before the United States District Court for the District of Puerto Rico. We will file an administrative charge before the Equal Employment Opportunity Commission as a preliminary step to going to the federal court. We will also file charges before OSHA for violations of its regulations. That was protected conduct. The court found that it was the same as the charge filed on November 8th. She made a prima facie case as to three instances, which were the PIP, the suspension, and the termination. We understand that the other email is also another adverse action. And in summary judgment, this court has been clear. Since charges in 1987, 88, in Kurshinov, in most recently in Soto Feliciano, when you have in retaliation a prima facie case and an articulation of a non-explanatory reason, summary judgment is not the best way to follow. And we understand that Ms. Michel is entitled to have a jury evaluate all the evidence that was presented to the district court. Any other questions? At this time I would like to reserve some time for rebuttal. But you only have 35 seconds. That would be fine. Okay. Ms. Flint, good afternoon. Good afternoon, Your Honor. May it please the court, Tacey Flint for Stereocycle. I'll start with retaliation, as my colleague did. The district court did find that Ms. Michel had made out a prima facie case of retaliation with respect to those three adverse employment actions. But the court also determined, based on the record, that Stereocycle had articulated legitimate business reasons, namely the performance problems that Judge Lynch referred to earlier. And Ms. Michel has not disputed the existence of those legitimate business reasons. That explained the non-retaliatory adverse employment actions. Now Ms. Michel has argued pretext. I'm glad you brought that up because I didn't want to interrupt you. But what do you have to say about the issue of whether there was a project manager position? Related to the discrimination claim? Yeah. That goes to the discrimination claim. And our view on discrimination is that the project manager position, as a position that entailed an increase in compensation and an addition in supervisory authority over Ms. Michel's previous job, did not exist. Is there evidence that people were holding that position, signing as project manager, and also getting pay that was maybe, I don't know if it was the one designated for that position, but higher than that of the regular employees? So there are two points, and I'd like to respond to both of them. With respect to the title, there is evidence, and the district court recognized this as a contested fact in the opinion, there is evidence that Mr. Rodriguez, the man who was allegedly promoted into that position, used the unofficial title IWSS program manager. But there is no evidence that Mr. Rodriguez received increased compensation as a result of doing any role with the biosystem program. Now the title alone, the unofficial title alone, given that there's no evidence of compensation or increase or supervisory authority, doesn't make this... Wasn't the supervisory authority carried out de facto? No, there's no evidence of supervisory authority de facto or explicit. Just to complete the thought on the title, an unofficial title doesn't rise to the level of a material employment action, which in the discrimination context is a significant hurdle. Plus, Ms. Macheo also had an unofficial title associated with the biosystem program, which was Sharpe's management system supervisor. So both she and Mr. Rodriguez, in association with that program, which was a new program and was sort of being sorted out while all this was going on, were permitted to use unofficial titles, but not given additional compensation related to their duties in that program. Excuse me, doesn't this all raise issues of fact? No, there are no issues of fact with respect to any of this. If the employer allows or doesn't allow the use of a title, it doesn't do anything about it, at least for a period of time, doesn't that raise some issues here? No, Your Honor. Ms. Macheo, to make out a pre-proficient case, had to show that there had been a material employment action here. And allowing one employee, Mr. Rodriguez, to use the title IWSS Program Manager, while allowing another employee, Ms. Macheo, to use the title SMS Supervisor, is not a material promotion, not a material employment action that favors Mr. Rodriguez over Ms. Macheo. So she has two other facts that she throws in. She doesn't allow the title loan. One is the pay. And I recognize you say there's no additional compensation given. In fact, he had higher pay, and you say that's because he was coming from a job that had higher pay back to this job. He also testified that his pay was adjusted down when he moved back into sales. And is there any evidence about what his pay was that contradicts that evidence? No, there's no evidence about his pay. The evidence regarding his pay after he moved from transportation back to sales is that it was adjusted down. There's no contrary evidence on that point? No. Okay. And Mr. Rodriguez didn't testify to the exact date that it was adjusted down, but he testified that it was adjusted down. When he was transferred, didn't Rodriguez say that sometime told him that the functions were going to be that of a program manager? That's right. The possible duties of a program manager were Mr. Rodriguez's words in his deposition. Well. So why isn't that enough to get to the jury? The unofficial title of the company allows them to use it, even though he doesn't get a pay increase and he actually gets a pay decrease when he goes back. And then the fact that Judge Torea has just highlighted, he was told he could use the title. Well, in that sense, he was exactly comparable to Ms. Macheo. He was not favored over her. And so she didn't suffer an adverse employment action by his having an unofficial title when she also had an unofficial title. And both took on, the record is clear, additional duties in connection with the White House Department of Labor. Ms. Macheo said that he used the title in the official company name of a program manager. What was her title? Her unofficial title? SMS, which stands for Sharpe's Management System Supervisor. So isn't program manager a better title? There's no evidence to tell us whether it is a better title. Certainly not in any material sense within the meaning of Title VII. Did he use a credit card, a recording card to that effect also? He had business cards with that title. So, but your point is somewhat different, which is that all of this may be true, but it doesn't show any discrimination against her, because she also was allowed to use an unofficial title. That's right. And she did. And she did. And there's no evidence that one unofficial title is better than the other. And the evidence that does go to material facts, such as compensation, supervisory authority, they're the same. And, I mean, I guess at some level that can't be, in the abstract it can't be entirely true in the sense that if his unofficial title was vice president and she was Sharpe's Management System, a reasonable jury could infer it's better to be the vice president, right? I'm not sure. I'm sure. But... So what about program manager? Was the idea that that just doesn't sound good enough? Well, IWSS, that stands, sorry for the acronyms, Integrated Waste Stream Solutions, the IWSS program and the Sharpe's Management System were two aspects of the biosystem program. So he's program manager of the IWSS and she's supervisor of SMS. There's no evidence that one sounds like vice president of Stericycle, Inc. and the other sounds like, you know, mailroom attendant or anything like that. The two titles both relate to functions in this new program biosystem. They both relate to duties that the two employees took on in connection with this program that was getting off the ground. There's no evidence that having one is some kind of material benefit over and above the other. Jumping back to the retaliation claim, could you just address what I took to be the argument runs, there was protected conduct with respect to retaliation. There was a legitimate business reason articulated for why they could dismiss her in response to the letter that was protected. They then say that that legitimate reason a jury could find to be pretextual because in Puerto Rico the standard is gross negligence or gross misconduct and the evidence put forward just couldn't meet that standard or a jury reasonably concluded that it didn't. Right, so this goes to whether Stericycle departed from its policies and whether that departure was evidence of pretext or could be interpreted by a jury to be evidence of pretext. They're relying on a 2005 guideline that went to managers discussing how Stericycle should handle employees. It was a guideline which also on its face, and this is clear in the appendix, stated that there was discretion. Now what we believe controls here, what we think is most relevant, is a 2012 employee handbook. The reason I think it's most relevant is that Ms. Macheu received this 2012 handbook. She signed and acknowledged receipt of it when she came on in employment. And the 2012 handbook spells out how employee performance problems would be dealt with. It says generally we'll use progressive discipline, verbal warning, written warning, so on and so on. Stericycle retains discretion to depart from this at any time and in particular Stericycle can use a performance improvement plan in lieu of any step. Now that's exactly what happened with Ms. Macheu. There were warnings, there were verbal warnings, there were written warnings, those are all on the record, and then a performance improvement plan was implemented after multiple problems had arisen. The performance improvement plan was originally not accepted by Ms. Macheu, as my counterpart described, and she was suspended. She came back, accepted the performance improvement plan and then violated it and was terminated. Okay, so the termination was because she violated the performance improvement plan and that's related to this third complaint about her being three hours late? That's right, that's the January 16, 2014 complaint. Couldn't a jury determine that's a pretty severe way of implementing the PIP? I mean, maybe a jury would conclude it was all just the way anybody would ordinarily apply it, but why couldn't a jury conclude that's pretty extreme? If she hadn't filed the complaint, she would not have been terminated for that kind of minor violation. A few reasons, Your Honor. First of all, this is a business judgment question. Keep in mind that the inquiry is whether this was a pretextual sham for firing Ms. Macheu as a result of retaliation rather than legitimate business reasons. Now, this wasn't the first instance of Ms. Macheu being, it's not just a matter of Ms. Macheu being three hours late or having car trouble or something. This was the last of a pretty lengthy series of events where Ms. Macheu did not show up at hospitals at times when she needed to be there to oversee installations of sharps management systems. That was her job, you know, in the biosystem program, ensuring that installation of sharps management systems worked well and happened. Now, on this particular occasion, a complaint came in. This wasn't jibbed up by Mr. Santana, her supervisor, or Ms. Bloomfield, the HR rep. The complaint came in from an outsider, Mr. Remisal, who was a contractor contracted with by Stericycle to engage in the installation. The installation was scheduled and Ms. Macheu did not appear. There had been many other instances before then where she had not appeared at hospitals for installations and other three to four times. Did the VIP warn her if there is any other instance of failure to appear or misconduct, you will be terminated? That's what the performance improvement plan says, yes. Yes, that is what it says. That's right. And so your position is, yes, they got an outside complaint, that after this long series and after the warning means that there was a legitimate non-discriminatory reason to terminate her. That's right. It was exactly within... And that's what the district court held. That's what the district court held. And this last violation was exactly within the target of the performance improvement plan. Is there any evidence in the record showing how this has been applied to other employees? The performance improvement plan? Yes. No, Your Honor. If there are no further questions, thank you. Thank you. May the judgment be affirmed. Mr. Gonzalez? In 35 seconds, page 953 speaks of an increase as seen by Mr. Rodriguez. What he understands is an increase. Page 944 tells of how he was officially announced by StereoCycle Puerto Rico as a program manager. And the policy by the company reads at page 1017 in Puerto Rico, this discretion to terminate without following progressive discipline may be exercised in situations that involve conduct or a pattern of conduct that amounts to gross misconduct. There is no evidence presented by StereoCycle of gross misconduct by Ms. Mitchell. Thank you very much. Thank you.